United States District Court
Southern District of Texas
**ENTERED**
February 25, 2025
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FRANKLIN MCMAHAN, | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 4:23-cv-2565 |
| | § | |
| C-INNOVATION LLC and GALLIANO | § | |
| MARINE SERVICE, LLC d/b/a EDISON | § | |
| CHOUEST OFFSHORE, | § | |
| | § | |
| *Defendants.* | § | |

## ORDER

Pending before the Court is C-Innovation LLC and Galliano Marine Service, LLC's (collectively, "Defendants") Motion for Summary Judgment. (Doc. No. 26); (Doc. No. 27) (sealed motion). Franklin McMahan ("Plaintiff") responded in opposition, (Doc. No. 28), to which Defendants replied, (Doc. No. 29); (Doc. No. 30) (sealed reply). Having considered the motion, the applicable law, and the summary-judgment evidence, the Court **DENIES** the Motion. (Doc. Nos. 26 & 27).

**I.     Background**

This is an alleged employment discrimination case based on Plaintiff's disability. While the parties do not agree on most of the factual background, they do agree that Plaintiff has Tourette's Syndrome, a neurological condition that causes uncontrolled motor movements. (Doc. No. 28-1 at 79:23–24). They also agree that, on June 21, 2019, Plaintiff was hired by Defendants as a Subsea Health, Safety, and Environment (HSE) Manager, reporting directly to the Subsea Manager (later, promoted to Vice President) David Sheetz.[1] (*Id.* at 32:12–33:17; 36:5–6). Lastly,

---

[1] Plaintiff alleges that Defendants operated as a single integrated enterprise and/or jointly employed him. (Doc. No. 1 at 3). Defendants deny that allegation, (Doc. No. 10 at 12), and argue that only C-Innovation, not Galliano Marine Service, employed him, (Doc. No. 26 at 5). At this point in the litigation, however, that issue is not relevant because

they agree that Plaintiff was terminated on April 8, 2022, purportedly "for performance reasons." (*Id.* at 112:9). Parties, however, strongly disagree with what happened between Plaintiff's hiring and termination and what caused the termination.

### A. Plaintiff's Version of Events

Plaintiff avers that, on or around November 2019, Plaintiff gave a presentation to British Petroleum ("BP") and other project partners in his capacity as the Subsea HSE Manager. (Doc. No. 28-4 at 1). After the presentation, Sheetz commented to Plaintiff, "You're always jerking and twitching and moving around, but you get up there and you're still and talk so well. What's up?" (*Id.*). Plaintiff then explained to Sheetz that he has Tourette's. (*Id.*). "After this disclosure," according to Plaintiff, Sheetz's behavior towards him changed. (*Id.*). Sheetz would make jokes and comments about Plaintiff's disability, such as, "Oh, what's that little dance you're doing," "How's the skipping down the hall going today," and "What's up Skippy, doing that little jerk thing again." (*Id.*). He also called Plaintiff "Twitchy" and "Skippy." (*Id.*). Some of these comments were made privately, but others were made in "an office full of people." (Doc. No. 28-1 at 58:25–59:12).

Plaintiff also claims that Sheetz treated him differently, avoiding him, ignoring his meeting requests, leaving the office just before the start of scheduled meetings with him, yelling at him, and "generally treating [him] with contempt and disrespect." (Doc. No. 28-4 at 1). Plaintiff testified at his deposition that he did not witness Sheetz treat anyone else in that manner. (Doc. No. 28-1 at 69:25–70:2).

According to Plaintiff, this created an environment in which other employees felt empowered to poke fun at Plaintiff's Tourette's. He avers that while he was conversing with

---

Defendants not only jointly move for summary judgment, but also do not argue that Galliano should be dismissed because it is not the employer. (*Id.*). Thus, for the purposes of this Order, the Court treats Defendants as an integrated enterprise or joint employers of Plaintiff.

Lorelei Scott, the Commercial Coordinator for Defendants, about a shoulder surgery he had received, Scott told Plaintiff that he should have reported the "weird twitching" to the surgeon so he could have "fixed that too." (Doc. No. 28-4 at 1); (Doc. No. 28-1 at 59:9–60:7).

Around September 2021, Plaintiff relayed his account of Sheetz's and Scott's alleged harassment to John Boquet, the HSE Manager in Defendants' Mandeville office. (Doc. 28-1 at 54:19; 58:4–62:3).

On March 30, 2022, unbeknownst to Plaintiff, Plaintiff's wife submitted an anonymous complaint of this alleged harassment through the company's ethics hotline. (Doc. No. 28-8); (Doc. No. 28-1 at 113:5–16). In it, she identified a "David (last name unknown)" as the "direct supervisor," and stated that "an employee (name withheld) of C Innovation office has been receiving bullying and harassing treatment from David, Erin, Lorelie [sic], and other employees (names and job titles unknown)." (Doc. No. 28-8 at 2). The next day, this complaint was forwarded to Sheetz, among others, who responded, "I am not aware of any situation in our office, nor has anyone brought any of this to my attention." (Doc. No. 28-7 at 1–2). Sheetz testified at his deposition that he understood the "David" mentioned in the complaint was himself. (Doc. No. 28-2 at 167:23–168:3). Defendant's organization chart shows that Sheetz is the "direct supervisor" for only nine individuals. (Doc. No. 28-6).

On April 7, 2022, when a number of Sheetz' team members returned from a long lunch at around 3:00 PM, Plaintiff, in a "kidding" manner, commented, "Hey, you guys had a long lunch. You know, you all must have been out . . . Maybe I should do a breathalyzer on you guys." (Doc. No. 28-1 at 106:8–17). He followed up with, "I'm just kidding with you guys." (*Id.*). Plaintiff further testified that the recipients of the alleged joke took it as such and laughed. (*Id.* at 107:8–9).

3

Sheetz, however, did not find it funny. The same day as the supposed joke, Sheetz texted Plaintiff, "Back off." (*Id.* at 106:19–21). Shortly thereafter, "very angry," Sheetz called Plaintiff and stated that Plaintiff "made an inappropriate joke" and accused him of "calling the open talk hotline," for which "he could fire [Plaintiff]." (*Id.* at 108:1–5). Plaintiff responded that he had not called the open talk hotline—indeed, he claims he did not learn of the hotline complaint by his wife until the next day, (*id.* at 113:5–12)—but that he did talk to Boquet regarding the specific instances of harassment. (*Id.* at 108:7–12). Sheetz then stated, "Whatever, I don't care. I got a file on you too." (*Id.* at 110:13–14). The very next day, Sheetz terminated Plaintiff, citing "performance reasons." (*Id.* at 112:9).

Importantly, and countering Defendants' version of events below, Plaintiff testified that he did not have any performance issues, let alone meet with Sheetz to discuss a performance improvement plan (described below). (*Id.* at 132:15–133:5); (*id.* at 219:10–15). Indeed, he testified that, even after he left, one of his supervisors, George Wilson, commented to him that Wilson "liked [Plaintiff's] work and respected and admired what [Plaintiff] did." (*Id.* at 219:18–21). Moreover, Plaintiff also denies any misconduct, (*id.* at 216:19–217:4), and the record shows no reported misconduct on Plaintiff's behalf.

### B. Defendants' Version of Events

Defendants paint a drastically different picture. Far from Plaintiff's suggestion that he first disclosed his Tourette's to Sheetz after his presentation in November 2019, Sheetz testified that he was "well aware that [Plaintiff] had Tourette's" before he hired Plaintiff. (Doc. No. 28-2 at 41:7). Moreover, while Sheetz does not deny that he conversed with Plaintiff regarding his Tourette's after the BP presentation, he claims that he congratulated Plaintiff for the successful presentation

4

and was merely asking why the tics did not show up during the presentation. (Doc. No. 26-1 at 57:9–22).

Rather than his sudden revelation of Tourette's being the turning point of Plaintiff's treatment at his job, Defendants contend that it was his performance. Wilson—who, Plaintiff testified, liked Plaintiff's work and respected and admired him—avers that, while Plaintiff was initially "very engaged and helpful," he became less so, requiring "at least two conversations with him asking him to please step up." (Doc. No. 26-10 at 1–2). Defendants point to plethora of other declarations and deposition transcripts from colleagues, supervisors, and clients to demonstrate that his performance was "sub-standard," (Doc. No. 26-11), his tasks were untimely completed or inappropriately delegated, (Doc. No. 26-12), and he was "lazy," "sloppy[,] and unprofessional," (Doc. No. 26-13).

To address these performance issues, Sheetz met with Plaintiff in July 2021 and issued him a verbal performance improvement plan. (Doc. No. 26-1 at 28:21–29:6). After the meeting, Sheetz memorialized this meeting by sending himself an email, with the subject line "fm" (presumably the initials of Franklin McMahan, Plaintiff), containing the list of items discussed during that meeting. (*Id.* at 29:7–11); (Doc. No. 26-14). Even after this meeting, however, Sheetz did not see any improvement. (Doc. No. 26-1 at 69:2–3). Sheetz thus discussed terminating Plaintiff with various individuals, including Richard Bourque (Chief Operating Officer), Billy Pellegrin (Vice President), and John Boquet (HSE Manager in the Mandeville office). (*Id.* at 69:68–71:20).

Compounding Plaintiff's workplace woes was his alleged inappropriate conduct at Defendants' COVID-delayed holiday party held in March 2021. Sheetz testified at his deposition that Plaintiff was intoxicated and made a circle with his left hand and a punching gesture with his right hand and asked a male colleague—repeatedly—"Are you pounding Erin?" (*Id.* at 116:2–11).

5

The Monday after, Sheetz discussed the incident with Plaintiff, who admitted that he got "entirely too drunk, and apologized, and said it would never happen again." (*Id.* at 117:1–10).

Sheetz claims Plaintiff's breathalyzer comment was the "straw that broke the camel's back." (*Id.* at 75:6–8). Sheetz perceived the breathalyzer comment as "bullying our guys for [Plaintiff's] not going to lunch with us that day." (*Id.* at 138:7–13). Thus, after sending the "back off" text, Sheetz called Plaintiff. (*Id.* 137:25–138:6). Contrary to what Plaintiff testified to, however, Sheetz denies ever mentioning the hotline complaint during the call. (*Id.* at 142:15–22). Instead, Sheetz testified that Plaintiff, in response to Sheetz's complaints about the breathalyzer comment, voluntarily offered up that the hotline complaint was not him but that he had complained to John Boquet. (*Id.* at 143:7–20).

Defendants' own evidence is somewhat contradictory as to what happened next. Sheetz testified that, the morning after the call with Plaintiff, Sheetz called Dionne Chouest Austin (the General Counsel who also oversaw Human Resources) to tell her that he wanted to terminate Plaintiff for the breathalyzer comment, but that the open complaint against Sheetz may make it appear like an improper termination. (*Id.* at 182:16–183:4). Sheetz also testified that Chouest Austin did not suggest investigating the complaint, but instead, told him that, as long as the termination is "performance based and that's the reason for the termination, then it's not an issue." (*Id.* at 182:5–6, 14–18).

Chouest Austin, on the other hand, testified that, after the initial call with Sheetz that morning, she told Sheetz to "[h]old off" while she conducted due diligence. (Doc. No. 26-8 at 105:8–10). She proceeded to conduct her due diligence on Plaintiff's performance issues by calling several individuals, all of whom confirmed that there were performance issues, and then she called Sheetz back and green-lit the termination. (*Id.* at 115:1–9).

6

C. **Procedural Background**

Based on his perceived version of events, Plaintiff brings the following causes of action: (1) Disability harassment under the Americans with Disabilities Act ("ADA"); (2) retaliation under the ADA; (3) disability harassment under the Texas Commission on Human Rights Act ("TCHRA"); and (4) retaliation under the TCHRA. (Doc. No. 1). Notably, "Plaintiff does not bring a separate claim for discriminatory termination. Plaintiff's claim regarding the termination of his employment is a retaliation claim, not a discrimination claim." (Doc. No. 28 at 6 n.1). Through this present motion, Defendants seeks summary judgment all of Plaintiff's claims. (Doc. No. 26).

II. **Legal Standard**

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in

favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III. Analysis

Plaintiff alleges disability harassment and retaliation in violation of both the ADA and TCHRA. (Doc. No. 1). "Because TCHRA parallels the language of the ADA, Texas courts follow [federal] ADA law in evaluating TCHRA discrimination claims." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 578 n.16 (5th Cir. 2020); *id.* at 586 n.65 (applying the same analysis to both ADA and TCHRA harassment claims); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 n.2, 348–49 (applying the same analysis to both ADA and TCHRA retaliation claims). As such, this Court also applies the same analysis to Plaintiff's ADA and TCHRA claims.

#### A. Disability Harassment under the ADA and TCHRA

To establish a harassment claim under the ADA and TCHRA, Plaintiff must show that: (1) he belongs to a protected group, (2) was subject to unwelcome harassment (3) based on his disability, (4) which affected a term, condition, or privilege of employment, and (5) Defendants knew or should have known of the harassment and failed to take prompt, remedial action. *Thompson v. Microsoft Corp.*, 2 F.4th 460, 471 (5th Cir. 2021). "Harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *Id.* In determining whether the harassment was sufficiently pervasive or severe, the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

Defendants' motion takes issue only with whether the alleged harassment was pervasive or severe enough.[2] For the purposes of their motion only, Defendants concede that those alleged comments by Sheetz about Plaintiff's disability were indeed made. (Doc. No. 26 at 25); (Doc. No. 30 at 10). Nevertheless, they argue, the comments do not rise to actionable harassment because "Sheetz made the comments to be funny or to make a joke." (Doc. No. 26 at 25).

That argument misses the mark. First, the subjective intent of the alleged harasser plays no role in the analysis here. *See Thompson*, 2 F.4th at 471 (listing out the factors in determining the pervasiveness or severity of harassment). Second, that Sheetz intended the comments as a joke does not address either the alleged ripple effect of the joke in the office or other, non-verbal treatment of Plaintiff by Sheetz. Plaintiff testified that Sheetz would make derogatory comments in "an office full of people." (Doc. No. 28-1 at 58:25–59:12). According to Plaintiff, after Sheetz made these comments, another coworker in the office made a disparaging comment to Plaintiff, telling him that he should have reported the "weird twitching" to his surgeon so that it could be "fixed." (Doc. No. 28-4 at 1). Thus, even if Sheetz subjectively intended his comments to be jokes, the evidence at least raises a fact issue as to the hostile ripple effect of such comments. If the comments—from Sheetz and more—were not enough, Plaintiff testifies that Sheetz treated Plaintiff with hostility and differently from other employees, including by avoiding him, ignoring his meeting requests, leaving the office just before the start of scheduled meetings with him, and yelling at him. (Doc. No. 28-4 at 1).

---

[2] Defendants' reply argues for the first time that Plaintiff cannot establish the second element—that the alleged harassment was "unwelcome." (Doc. No. 30 at 10). "Arguments raised for the first time in reply briefs are forfeited." *Am. Guar. & Liab. Ins. Co. v. U.S. Fire Ins. Co.*, 255 F. Supp. 3d 677, 691 (S.D. Tex. 2017) (Rosenthal, C.J.) *aff'd sub nom. Satterfield & Pontikes Constr. Inc. v. U.S. Fire. Ins. Co.*, 898 F.3d 574 (5th Cir. 2018). Even if that argument was not forfeited, it is unpersuasive, at least as a matter of law. Defendants argue that Plaintiff never told Defendants that the comments were offensive, and thus, Plaintiff "solicited or incited the alleged harassment." (Doc. No. 30 at 10–11). It seems somewhat tenous to conclude as a matter of law that an employee hesitating to call out his own direct supervisor on his alleged harassment or even reluctantly playing along is solicitation or incitement of that harassment.

9

A reasonable jury could find that most of the factors in determining the pervasiveness or severity of the harassment weigh in favor of Plaintiff. These factors are: the frequency; the severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Thompson*, F.4th at 471. First, drawing inferences from the evidence in Plaintiff's favor—as it must at this stage—the Court finds that the alleged harassment Plaintiff faced was frequent enough for this factor to weigh, albeit slightly, in his favor. A little over two years had passed between Plaintiff's alleged disclosure of his Tourette's and termination. In that time, Plaintiff testifies, he has faced numerous hostile comments and behavior. His declaration states that Sheetz has made several comments, such as "What's that little dance you're doing," "How's the skipping down the hall going today," "What's up Skippy, doing that little jerk thing again," and calling Plaintiff "Twitchy" and "Skippy." (Doc. No. 28-4 at 1). Moreover, another coworker commented on his disability and called it "weird twitching." (Doc. No. 28-4 at 1). On top of that, Plaintiff raise the hostile treatment he allegedly received from Sheetz, including avoiding him, ignoring him, leaving the office just before the start of scheduled meetings, yelling at him, and "generally treating [him] with contempt and disrespect." (*Id.*). These numerous instances, if believed, would allow a reasonable jury to conclude that these were more than one-off comments, but rather, continued and repeated, verbal and non-verbal harassment.

Second, the same evidence would allow a reasonable jury to conclude that the harassment was severe. The comments specifically concerned Plaintiff's disability (not, for example, his personality or work product), and Plaintiff could not avoid Sheetz's alleged hostile conduct, given that it related to Plaintiff's day-to-day work. Moreover, as Plaintiff testified, Sheetz's hostile comments were sometimes made in "an office full of people." (Doc. No. 28-1 at 58:25–59:12).

Additionally, another coworker—allegedly after hearing Sheetz's comments—also felt that she could comment on his disability, calling it "weird twitching" and that it was something that needs to be "fixed." (Doc. No. 28-4 at 1). These adverse comments and unbecoming conduct, at the very least, raise fact issues as to the severity of the alleged harassment, and thus, a reasonable jury could conclude that this factor weighs in Plaintiff's favor.

Third and fourth, while Plaintiff does not argue that he received any physical threats or humiliation, and thus, the third factor weighs against Plaintiff, Plaintiff's evidence at least raises fact issues on the fourth factor—whether the hostile treatment he allegedly received unreasonably interfered with his work performance. As explained above, Plaintiff avers that Sheetz avoided him, ignored his meeting requests, left the office just before the start of scheduled meetings with him, and yelled at him. (Doc. No. 28-4 at 1). A reasonable jury could conclude that the inability to converse and meet with Plaintiff's direct supervisor unreasonably interfered with his work performance. Accordingly, as a reasonable jury could conclude that three out of the four factors weigh in favor of Plaintiff, Defendants' motion is denied as to the harassment claims under the ADA and TCHRA.

### B. Retaliation under the ADA and TCHRA

To show unlawful retaliation, Plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA and TCHRA; (2) an adverse employment action; and (3) a causal connection between the protected act and the adverse action. *Nall*, 917 F.3d at 348–49. Once Plaintiff establishes this *prima facie* case, Defendants must then come forward with a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 349. If such a reason is advanced, Plaintiff must adduce sufficient evidence that the proffered reason is a pretext for

retaliation. *Id.* "Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Id.*

### i.  *Prima Facie* Case

Plaintiff puts forth two possible instances of protected activity: (1) complaining to Boquet in September 2021, and (2) informing Sheetz, in a phone call on the eve of his termination, of the specific instances of discrimination that Plaintiff faced and complained of to Boquet. (Doc. No. 28 at 16). The parties do not dispute that informing Boquet or Sheetz of the alleged harassment constitutes protected activity or that Plaintiff suffered an adverse employment action. The remaining question, therefore, is whether there is a causal connection between the protected activities and the adverse action.

Plaintiff cannot establish that the conversation with Boquet is causally connected to his termination. Nothing in the record indicates that Boquet ever relayed Plaintiff's complaints to another party, let alone to anyone with decision-making power over Plaintiff's employment. Moreover, about seven months had passed since Plaintiff's call with Boquet and his eventual termination. The Fifth Circuit has held that, in establishing causation, "a six-and-a-half-week timeframe is sufficiently close . . . [but] a five month lapse is not close enough." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020). If a five-month lapse is insufficient, so is a seven-month lapse. Without a decision-maker's knowledge of Plaintiff's complaint Boquet or temporal proximity, Plaintiff cannot satisfy the causal connection between the call with Boquet and the adverse employment action.

There is, on the other hand, sufficient evidence of a causal connection between the conversation with Sheetz and Plaintiff's termination to survive summary judgment. Unlike with the call with Boquet, the call with Sheetz occurred mere one day before the termination. That

clearly satisfies the temporal proximity. To be sure, the Fifth Circuit has also "affirmatively reject[ed] the notion that temporal proximity standing alone can be sufficient proof of but for causation." *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007). Here, however, the temporal proximity does not stand alone. Plaintiff points to evidence in the record that demonstrates that Sheetz accused Plaintiff of calling the hotline, for which, Sheetz allegedly stated, "he could fire [Plaintiff]." (Doc. No. 28-1 at 108:1–5). Moreover, when Plaintiff told Sheetz that Plaintiff had talked to Boquet—and, in the process, told Sheetz of the alleged instances of harassment—Sheetz responded with, "Whatever, I don't care. I got a file on you too." (*Id.* at 110:13–14). The very next day, Plaintiff was fired. Thus, the temporal proximity of less than 24 hours, combined with Sheetz's alleged comments, suffices to create a causal connection at this summary-judgment stage.

The Court recognizes that Defendants vehemently dispute Plaintiff's version of facts. (Doc. No. 29 at 15–17). They contend that it was the breathalyzer comment, made not in a joking way, but "in an angry, petulant tone," other inappropriate conduct, and Plaintiff's continued performance issues that caused Sheetz to terminate him. (*Id.* at 16). They also deny that Sheetz first mentioned the hotline complaint to Plaintiff. (Doc. No. 26-1 at 142:15–22). The Court, however, is not in the position to weigh and resolve this factual dispute at this summary-judgment stage. It need only resolve the question of whether a reasonable jury could conclude that, once hearing Plaintiff's complaints of harassment, Sheetz acted to terminate Plaintiff. Thus, the Court concludes that Plaintiff has established his *prima face* case.

### ii.     Legitimate, Non-Discriminatory Reason & Pretext

Defendants advance a legitimate, non-discriminatory reason for the termination— Plaintiff's alleged poor work performance and inappropriate conduct, including, but not limited to,

13

the breathalyzer incident. (Doc. No. 26 at 28). Plaintiff must, therefore, adduce sufficient evidence that raises a fact issue on whether the proffered reason is a pretext for retaliation.

Plaintiff has carried that burden. First, Plaintiff testified that Sheetz specifically mentioned that he could terminate Plaintiff for lodging a hotline complaint and that Sheetz "got a file" on Plaintiff, so he is not concerned about Plaintiff's complaints. (Doc. No. 28-1 at 108:1–5; 110:13–14). Second, Plaintiff also testified that he did not have any work performance issues or meet with Sheetz to discuss a performance improvement plan. (*Id.* at 132:15–133:5); (*id.* at 219:10–15). Indeed, Plaintiff's evidence shows that, even after Plaintiff's termination, one of his supervisors, George Wilson, told Plaintiff that he "liked [Plaintiff's] work and respected and admired what [Plaintiff] did." (*Id.* at 219:18–21). Third, his sworn testimony also denies any misconduct, including making sexual comments and gestures at the office Christmas party. (*Id.* at 216:19–217:4). Fourth, contrary to Defendants' characterization of the breathalyzer comment, Plaintiff testified that he expressly specified that he was "kidding" and that the recipients of the alleged joke laughed. (*Id.* at 106:8–17; 107:8–9). All of this evidence, read in the light most favorable to Plaintiff, suffice to raise fact issues as to pretext. Consequently, Defendants' summary-judgment motion as to Plaintiff's retaliation claims are denied.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED**. (Doc. Nos. 26 & 27).

Signed on this 25 day of February 2025.

Andrew S. Hanen
United States District Judge